ARMOUR & CO. v. ARBUCKLE.

(Circuit Court of Appeals, Eighth Circuit. April 15, 1913.)

No. 3,837.

1. MASTER AND SERVANT (§ 264*)—INJURIES TO SERVANT—DEFECTIVE BUILDING—PETITION—VARIANCE.

Where, in an action for injuries to a servant by the collapse of a part of a building he was assisting to repair, the petition alleged that the building at the time of the accident and for a long time prior thereto had been an unsafe place in which to work, and a recovery was sought on that theory, it was error for the court to permit plaintiff to prove a different case, and authorize a recovery on the ground that, even though the place was safe, defendant's foreman, acting as a vice principal, was negligent in adopting an unsafe method of work; such evidence constituting a fatal variance.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

2. PLEADING (§ 237*)—AMENDMENT—CONFORMITY TO PROOF.

Where, in an action for injuries to a servant by the collapse of a part of a building, plaintiff pleaded negligence in defendant's failure to provide a safe place to work, and introduced evidence of negligence of defendant's foreman in adopting an unsafe method of work, the petition could have been amended at the trial on terms to conform to the proof.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 603–619; Dec. Dig. § 237.*]

In Error to the District Court of the United States for the District of Nebraska; Page Morris, Judge.

Action by Smith Arbuckle against Armour & Co. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

T. J. Mahoney, of Omaha, Neb. (J. A. C. Kennedy, of Omaha, Neb., on the brief), for plaintiff in error.

M. F. Harrington, of O'Neill, Neb. (R. M. Johnson, of Stuart, Neb., on the brief), for defendant in error.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

SMITH, Circuit Judge. Armour & Co. is an Illinois corporation engaged in packing meats, with its principal place of business at Chicago, Ill., but operating a branch packing plant at South Omaha, Neb. In connection with its plant it has a large icehouse about 30 miles out of South Omaha at Memphis, Neb. This icehouse was over 650 feet long from north to south and about 175 feet wide from east to west. It was divided into rooms about 32 feet wide running through the building from east to west. There were sills extending entirely around the house and along the lines of the partitions. Upon these sills rested 2x12 studding 18 inches apart and 32 feet long, sheeted on both sides with one-inch material. Every 16 feet there was a truss from north to south across each room, which constituted the only support of the roof. Where the truss rested upon the side walls, four studding were cut down and a block or corbel put across to bear the weight

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

205 F.—18

of the truss. Two of these trusses in adjoining rooms met upon the same corbel. Across the bottom members of these trusses extended joists from east to west, and on them a floor was laid with large quantities of sawdust spread over it to protect the ice. This floor was about 34 feet from the ground. It was decided to strengthen and improve these icehouses by taking out one studding under each corbel and insert a 10x10 timber and place thereon a new corbel and rest the truss upon it. It was decided to cut through the sills every place where one of the new 10x10 upright timbers was to go, and put in a concrete base and rest the new timber directly on this base. Different sets of men were employed by Armour & Co. upon this work. It appears that one set of men would go in and cut out the sill and a part of the studding and sheeting immediately above it, cut down the sheeting on the side they were working on on both sides of the studding to be removed from top to bottom, and put in the concrete base.

Smith Arbuckle was with a body of men who would then go in, remove the studding, put up the new timber, put a new corbel on top, and rest the truss upon it. In doing this Arbuckle and two others went up upon the second floor, covered with sawdust, and would clean away the sawdust in the immediate vicinity of the end of a truss, cut a hole through the floor, and drop a rope attached to a pulley supported from the truss above through the opening. A rope would then be attached to the lower end of the studding to be removed, carried back around the pulley, and several men would pull on the rope, and another man would go up in a swing tapping the sheeting on the other side of the partition and loosen it from the studding, and so the latter would gradually be dragged out, coming loose last at the top. The chief duty of Arbuckle had relation to the handling of the rope and pulley from the second floor, and the men with him would, after the studding had been removed, knock the old corbel loose. There was furnished a supply of timbers called "pump logs." After a studding and corbel had been removed, one of these pump logs was inserted from the ground to the truss and raised with a jackscrew, so as to lift the truss and permit the insertion of the new corbel, and the truss was then let down upon it. On November 21, 1911, while Arbuckle and his two companions were on the second floor, and after four studding had been thus removed, and a fifth substantially so, by giving away of the supports the north ends of three of the trusses over the space from which the studding had been removed came down, and the same happened to the south ends of the trusses upon the other side of the partition, and Arbuckle and his companions were precipitated to the floor below; Arbuckle sustaining serious injuries. He brought suit for $40,575. The case was tried to a jury, who awarded him $10,000, for which judgment was rendered, and Armour & Co. brought the case here on error.

The allegations of negligence were:

"That at said time and for a long time prior thereto the defendant carelessly and negligently maintained said floor in a rotten, loose, shaky, unsound, and unsafe condition, and also maintained the sills, beams, posts, tim-

bers, and boards on which it rested and of which it consisted in a rotten, shaky, loose, unsafe, and unsound condition, and maintained all of said floor, boards, posts, beams, and timbers negligently and recklessly and carelessly, and in a rotten, shaky, unsafe, and unsound condition, and in such condition that said floor, boards, sills, beams, posts, and timbers were in danger of falling and collapsing at any time, and endangering the life of plaintiff and other persons working where plaintiff was working, and all persons who might be, or whose work required them to be, standing upon the sawdust which was on said floor. That on said date, while the plaintiff was so at work, the said floor, posts, sills, beams, and timbers broke, collapsed, and fell a distance of 32 feet, whereby the plaintiff was thrown, crushed, mangled, bruised, and injured."

Under these allegations the court permitted the plaintiff below to show the facts that the underpinning had been removed in part from each truss, that the sills had been cut away, the studding torn out, that no pump logs had been erected under the four trusses preceding the one on which plaintiff was working at the time of the accident, and that the company had a vice principal present who was negligent in the management of the repairs.

[1] The petition in substance said that the building was at the time of the accident, and for a long time prior thereto had been, an unsafe place in which to work, and a recovery was sought upon that ground; but a recovery was permitted upon the theory that, even if the place was entirely safe, the workmen by the manner in which they did the work brought on the accident, and liability was sought to be imposed on Armour & Co. by showing the work was under the charge of a vice principal. Not only was the plaintiff permitted to prove a case radically different from that alleged, but the court instructed the jury:

"The claim of the plaintiff is that it was negligent in the then condition of those pieces of timber to do that work in the manner in which they were doing it, to leave the ends of those upright pieces of studding unsupported, and that by reason of that fact this young man was injured by the falling of that floor; plaintiff's claim being that the defendant was negligent as to the manner of conducting the work at the time, in view of the condition of those pieces of timber making up these partitions in these various structures."

The court thus not only permitted the plaintiff to prove a case wholly different from that alleged, but told the jury that the plaintiff claimed that it was negligent to do that work in the manner in which they were doing it when there was no such claim in the petition. There was a fatal variance between the case stated and the one made, and the court in effect told the jury that they could find a verdict upon the case made rather than upon the one alleged.

[2] Upon just terms the petition could have been amended at the trial, and possibly thereafter, to conform the allegations to the proof; but this was not done, and the case is reversed and remanded, with directions to set aside the judgment heretofore entered and grant a new trial.